UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

---

Genmar Holding, Inc.,
Genmar Industries, Inc. an Indirect
Subsidiary of Genmar Holdings, Inc.,
and Lund Boats, a Division of Genmar
Industries, Inc.

Case File No. 01-CV-639 (JRT/RLE)

Plaintiffs,

**ORDER ENFORCING SETTLEMENT AGREEMENT**

v.

Gary Duane Schultz,

Defendant.

---

This matter comes before the Court upon Plaintiffs' Motion to Enforce the Settlement Agreement, through which Plaintiffs seek to enforce full compliance with paragraph II.C.4.d of the Settlement Agreement between the parties. The Settlement Agreement was entered into on January 10, 2002. This Court retained jurisdiction to enforce it in an Order dated January 22, 2002.

**Therefore,** based upon the files, records, pleadings and proceedings herein, and the arguments of counsel,

**IT IS HEREBY ORDERED:**

1. Plaintiffs' Motion is GRANTED.

2. Defendant is ordered to deliver an executed warranty deed in the form of Exhibit A to this Order to Plaintiffs' counsel within five (5) business days of entry of this Order.

FILED AUG 2 9 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED AUG 2 9 2003
DEPUTY CLERK'S INTIALS

**EXHIBIT A**

3. Defendant is ordered to pay the attorneys fees and costs of bringing this Motion.

Let Judgment Be Entered Accordingly.

Dated: August 28, 2003

John R. Tunheim

The Hon. John R. Tunheim
United States District Judge

Miller-Davis Legal Forms
Minnesota Uniform Conveyancing Blanks (1978)

WARRANTY DEED

Form No. 3-M

No delinquent taxes and transfer entered; Certificate of Real Estate Value ( ) filed ( ) not required
Certificate of Real Estate Value No. ________

________
(Date)

________ ________ County Auditor

by ________ Deputy

(reserved for recording data)

DEED TAX DUE HEREON: $ 1.65

Date: March ___, 2003

FOR VALUABLE CONSIDERATION, **Barbara A. Schultz** and **Gary D. Schultz**, wife and husband, and **Tammy Peters** and __________ **Peters**, wife and husband, Grantors, hereby convey and warrant to **Genmar Industries, Inc.**, a Delaware corporation, Grantee, real property in Otter Tail County, Minnesota, described as follows:

> The W ½ of SW ¼ and the W ½ of NW ¼, all in Section 8, Township 136, Range 37, Otter Tail County, Minnesota,

together with all hereditaments and appurtenances belonging thereto.

Consideration for this conveyance is less than $500.00

Grantors certify that Grantors do not know of any wells on the described real property.

*Affix Deed Tax Stamp Here*

________
Barbara A. Schultz

________
Gary D. Schultz

STATE OF MINNESOTA
}SS.
COUNTY OF ________

The foregoing instrument was acknowledged before me this ___ day of March, 2003, by Barbara A. Schultz and Gary D. Schultz, wife and husband, Grantors.

NOTARIAL STAMP OR SEAL (OR OTHER TITLE OR RANK)

________
SIGNATURE OF PERSON TAKING ACKNOWLEDGEMENT

______________________________
Tammy Peters

______________________________
__________ Peters

STATE OF MINNESOTA
}SS.
COUNTY OF ____________

The foregoing instrument was acknowledged before me this ____ day of March, 2003, by Tammy Peters and __________ Peters, wife and husband, Grantors.

NOTARIAL STAMP OR SEAL (OR OTHER TITLE OR RANK)

______ ____________________________
SIGNATURE OF PERSON TAKING ACKNOWLEDGEMENT

Check here if part or all of the land is Registered (Torrens) ☐

Tax Statements for the real property described in this instrument should be sent to (Include Name and address of Grantee)

Genmar Industries, Inc.
2900 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

THIS INSTRUMENT WAS DRAFTED BY (NAME AND ADDRESS)

Lindquist & Vennum P.L.L.P. (LLK)
4200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 371-3211

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Genmar Holdings, Inc., Genmar Industries, Inc., an Indirect Subsidiary of Genmar Holdings, Inc., and Lund Boats, a Division of Genmar Industries, Inc., Plaintiffs, vs. Gary Duane Schultz, Defendant. | ) | Civil File No. 01-CV-639 JRT/RLE **ORDER** |

This matter came on for hearing before the undersigned on January 25, 2002. Dorsey & Whitney LLP and Janice M. Symchych, Esq. appeared on behalf of Plaintiffs, and Greene Espel, P.L.L.P. and William H. Hefner, Esq. appeared on behalf of Defendant. Pursuant to the arguments of counsel and all the files and proceedings herein, **IT IS HEREBY ORDERED**:

1. Pursuant to Fed. R. Civ. P. 54 and 58(a), and the filed Settlement Agreement of the parties and executed Confession of Judgment, the Clerk of Court is directed to enter judgment against Defendant in the amount of $ 13,501,249.15;

2. Enforcement of judgment shall proceed pursuant to the terms of the Settlement Agreement of the parties in lieu of Fed. R. Civ. P. 69(a), except that Plaintiffs may reserve, during any time prior to full satisfaction of judgment, the right to proceed pursuant to Rule 69(a) by way of writ of execution, upon notice of motion and motion to the Court;

3. Assets of Defendant, which are frozen pursuant to the Attachment Order of April 17, 2001, and the Supplemental Order for Attachment dated April 23, 2001, shall be released

FILED FEB [illegible]
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

**EXHIBIT B**

and simultaneously transferred to Plaintiffs or retained by Defendants as set forth in Supplementary Orders A-F, executed this date, and such other orders which may follow from time to time; and

4. This Court shall retain jurisdiction over this matter until such time as the judgment is satisfied, and shall from time to time consider such matters as are necessary to enforce the Settlement Agreement and Confession of Judgment.

Dated: 2-7-2002

John R. Tunheim
Judge of United States District Court
For the District of Minnesota

2200 IDS CENTER
80 SOUTH EIGHTH STREET
MINNEAPOLIS, MINNESOTA 55402
TELEPHONE (612) 977-8400
FACSIMILE (612) 977-8650

**BRIGGS AND MORGAN**

PROFESSIONAL ASSOCIATION

WRITER'S DIRECT DIAL

(612) 977-8438

WRITER'S E-MAIL

kmagnuson@briggs.com

October 29, 2003

**VIA: FEDERAL EXPRESS & U.S. MAIL**

Barbara Schultz
43178 County Highway 137
New York Mills, MN 56567

**Re: Schultz/Genmar Industries, Inc.**

Dear Ms. Schultz:

On August 29, 2003, the U.S. District Court for the District Court of Minnesota ordered you, pursuant to the settlement agreement, to deliver an executed warranty deed for Parcel No. R33000080047000 in the form of Exhibit A attached to the Court's Order within five (5) days of the entry of the Order—August 29, 2003. (*See* attached Order.) Pursuant to a request from U.S. District Judge John R. Tunheim, Genmar has afforded you an additional 45 days from the entry of the Court's Order to comply with the Order and secure the $65,000 required under the settlement agreement or execute the warranty deed. The 45 day extension came and went on **Monday, October 13, 2003**. This letter is final notice of your obligation to comply with the Court's Order. Genmar now has no choice other than to enforce the Court's Order. To avoid this action, immediately send to me at the following address a certified cashier's check in the amount of $65,000 or the executed warranty deed and notify me immediately by either fax or phone of your intent to do so:

Kevin M. Magnuson
Briggs and Morgan P.A.
2200 IDS Center
80 S. 8th St.
Minneapolis, MN 55402-2157

If you have any questions, please do not hesitate to contact me.

**EXHIBIT C**

1583527v1

Very truly yours,

Kevin M. Magnuson

KMM/krw
Enc.
cc: The Honorable John R. Tunheim (w/o enc.)
Bill Lutz, Esq. (w/o enc.)

Miller-Davis Legal Form
Minnesota Uniform Conveyancing Blanks (1978)

Form No. 3-M

WARRANTY DEED

No delinquent taxes and transfer entered; Certificate of Real Estate Value ( ) filed ( ) not required
Certificate of Real Estate Value No. ________

________ (Date)

________ County Auditor

by ________ Deputy

(reserved for recording data)

DEED TAX DUE HEREON: $ 1.65

Date: March ___, 2003

FOR VALUABLE CONSIDERATION, **Barbara A. Schultz** and **Gary D. Schultz**, wife and husband, and **Tammy Peters** and ________ **Peters**, wife and husband, Grantors, hereby convey and warrant to **Genmar Industries, Inc.**, a Delaware corporation, Grantee, real property in Otter Tail County, Minnesota, described as follows:

The W ½ of SW ¼ and the W ½ of NW ¼, all in Section 8, Township 136, Range 37, Otter Tail County, Minnesota,

together with all hereditaments and appurtenances belonging thereto.

Consideration for this conveyance is less than $500.00

Grantors certify that Grantors do not know of any wells on the described real property.

*Affix Deed Tax Stamp Here*

Barbara A. Schultz

________
Gary D. Schultz

STATE OF MINNESOTA
}SS.
COUNTY OF ________

The foregoing instrument was acknowledged before me this ____ day of March, 2003, by Barbara A. Schultz and Gary D. Schultz, wife and husband, Grantors.

NOTARIAL STAMP OR SEAL (OR OTHER TITLE OR RANK)

________
SIGNATURE OF PERSON TAKING ACKNOWLEDGMENT

**EXHIBIT D**

Tammy Peters

__________ Peters

STATE OF MINNESOTA
}SS.
COUNTY OF ____________

The foregoing instrument was acknowledged before me this ____ day of March, 2003, by Tammy Peters and __________ Peters, wife and husband, Grantors.

NOTARIAL STAMP OR SEAL (OR OTHER TITLE OR RANK)

SIGNATURE OF PERSON TAKING ACKNOWLEDGEMENT

Check here if part or all of the land is Registered (Torrens) ☐

Tax Statements for the real property described in this instrument should be sent to (Include Name and address of Grantee)

Genmar Industries, Inc.
2900 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

THIS INSTRUMENT WAS DRAFTED BY (NAME AND ADDRESS)

Lindquist & Vennum P.L.L.P. (LLK)
4200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 371-3211

MAY 1 0 2004

# Velde Law Firm, Ltd.

Attorneys At Law

David G. Velde
Brenda Velde
Logan Moore
Jennifer B. Klecker
Nan I. Haggerty

1118 Broadway
Alexandria, Minnesota 56308
veldebv@rea-alp.com

Fax (320) 763-6564
Telephone (320) 763-6561

May 7, 2004

Mr. Kevin M. Magnuson, Esq.
Briggs & Morgan
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2157

RE: Barb Schultz

Dear Mr. Magnuson:

Pursuant to our phone conversation on April 19, 2004 I had expected to have received the "Executed Partial Satisfaction of the Confession of Judgment" from Genmar by now. I made my first written request for this on February 12, 2004 although I had made prior oral requests to both yourself and James Long and have made two subsequent written requests. We are now coming up on the third June 1st deadline for Genmar to provide the Partial Satisfaction of Judgment.

The Schultzs did not get the required partial satisfaction in 2002 or 2003. Performance of their part of the Agreement is sorely lacking.

Lastly, I will advise my client that you want another deed executed by my client in the presence of a notary public.

Sincerely,

Brenda Velde

cc: Barbara Schultz

W:\2003\03-040\mltr.wpd

**EXHIBIT E**

N. F. FIELD ABSTRACT CO., INC.
125 South Mill Street / P.O. Box 697
Fergus Falls, Minnesota 56538-0697
(218)739-5476 or (218)736-6844
FAX (218)736-5988

## MEMORANDUM OF CHARGES

Account No.:

FILE NO.: 21621
Date: December 12, 2003

Customer: Regina Walsh/Briggs & Morgan, PA
2200 First Nat'l Bk Bldg
332 Minnesota Street
Saint Paul, MN 55101
Attn:
651-808-6450

Copies To:

Legal Description: W1/2SW1/4,S1/2NW1/4 8-136-37
Property Address: 53189 440th Street
City: New York Mills, Minnesota 56567
Reference: Genmar Holdings, Inc.

Amount of Insurance

$ 161,746.00 Owner's
$ Mortgagee's

| | Transactions | Charges |
|---|---|---|
| Premium | 1 | 592.50 |
| Simultaneous Issue | 3 | |
| Service Fee | 4 | 150.00 |
| Searches - Assessments | 5 | |
| Plat Drawing | 8 | |
| Name Search | 6 | |
| Reissue Credit | 7 | |
| Other TRACT SEARCH | | 200.00 |
| Other | | |
| Other | | |
| TOTAL CHARGES | | 942.50 |

Transaction Codes

1. Owner's Policy
2. Mortgage Policy
3. Simultaneous Issue
4. Service Fee
5. Special & Pending Assessments
6. Name Search
7. Reissue Credit
8. Plat Drawing
9. Recording Fees
10. Endorsement
11. Closing Fee
12. Other

**THIS IS NOT AN INVOICE**

EXHIBIT F

# COMMITMENT

## SCHEDULE A

File No.: 21621

| | | Policy Amount |
|---|---|---|
| 1. | **Commitment Date:** December 1st, 2003 at 8:00 A.M. | |
| 2. | **Policy (or policies) to be issued:** | |
| | (a) ______ **ALTA Residential Owner's Policy - 1987**<br>**Proposed Insured:** | $ |
| | __XX__ **ALTA Form B Owner's Policy - 1992**<br>**Proposed Insured:** Genmar Holdings, Inc. | $161,746.00 |
| | (b) ______ **ALTA Long Form Loan Policy - 1992**<br>**Proposed Insured:** | $ |
| | ______ **ALTA Short Form Loan Policy - 1992**<br>**Proposed Insured:** | $ |

3. **The fee interest in the land described in this Commitment is owned, at the Commitment Date, by:**

   Barbara Schultz and Tammy Peters

4. **The land referred to in this Commitment is described in Schedule "C".**

**Informational Notes:**

1. Arrangements to reserve a closing date must be made through the Real Estate Closer or Lender. These arrangements must allow for adequate time between the written Loan Commitment and the date of closing. Failure to allow for adequate time may result in the requested closing date not being available.

2. This commitment is for the exclusive use of N.F. Field Abstract Co. and Old Republic National Title Insurance Company in closing the transaction described herein. Anyone else closing off this Commitment shall be liable to N.F. Field Abstract Co. for all loss and damage, including payment of all charges for services rendered.

3. If there are any questions concerning this Commitment, please call Dacia Teberg at (218) 739-5476.

Issued By Agent:
**N. F. FIELD ABSTRACT CO., INC.**
125 South Mill Street / P.O. Box 697
Fergus Falls, Minnesota 56538-0697
(218)739-5476 or (218)736-6844

COMMITMENT

**SCHEDULE B - SECTION I**

**REQUIREMENTS** File No. 21621

**The following requirements must be met:**

(a) Pay the agreed amounts for the interest in the land and/or the mortgage to be insured.

(b) Pay us the premiums, fees and charges for the policy.

(c) You must tell us in writing the name of anyone not referred to in this Commitment who will get an interest in the land or who will make a loan on the land. We may then make additional requirements or exceptions.

(d) Documents satisfactory to us creating the interest in the land and/or the mortgage to be insured must be signed, delivered and recorded:

1. A Deed from Barbara Schultz and Tammy Peters and spouses if any, to Genmar Holdings, Inc..

2. Certificate of Real Estate Value for Land.

3. Well Certificate or appropriate phrase on deed.

4. Company's Affidavit By Seller executed by Barbara Schultz and Tammy Peters.

5. Obtain for recording release of the following judgments and/or tax liens, or furnish the Company with affidavits establishing that Barbara Schultz is not the same person named in the following:

   Judgment against Barbara Schultz, in favor of Cit Group/Equipment Financing, Inc., dated October 25, 2002, docketed October 25, 2002, in the amount of $111,906.90.

6. Order for Attachment filed for record on May 2, 2001 as Document No. 880698.

Issued By Agent:
**N. F. FIELD ABSTRACT CO., INC.**
125 South Mill Street / P.O. Box 697
Fergus Falls, Minnesota 56538-0697
(218)739-5476 or (218)736-6844

COMMITMENT

**SCHEDULE B - SECTION II**

**EXCEPTIONS** File No. 21621

**Any policy we issue will have the following exceptions unless they are taken care of to our satisfaction:**

1. Defects, liens, encumbrances, adverse claims or other matters, if any; created, first appearing in the public records, or attaching subsequent to the effective date hereof but prior to the date the proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.
2. Any encroachments, measurements, party walls, or other facts which a correct survey of the premises would show.
3. Rights or claims of parties in possession not shown by the public records.
4. Easements, or claims of easements, not shown by the public records.
5. Any lien, or right to lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.
6. All assessments and taxes due and payable in 2003, and thereafter.
7. Taxes are paid in full for the year 2003 in the amount of $766.00. Property Identification Number 33-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-000.
8. Township Road.

Issued By Agent:

**N. F. FIELD ABSTRACT CO., INC.**
125 South Mill Street / P.O. Box 697
Fergus Falls, Minnesota 56538-0697
(218)739-5476 or (218)736-6844

File No. 21621

**SCHEDULE C**

The land referred to is situated in the State of Minnesota, County of Otter Tail, and is described as follows:

The W1/2 of SW1/4 and W1/2 of NW1/4 of Section 8, Township 136, Range 37, Otter Tail County, Minnesota

Issued By Agent:
**N. F. FIELD ABSTRACT CO., INC.**
125 South Mill Street / P.O. Box 697
Fergus Falls, Minnesota 56538-0697
(218)739-5476 or (218)736-6844

Individual

**State of Minnesota** } ss.

County of ____________________

## Affidavit Regarding Seller(s)

Barbara Schultz and Tammy Peters ____________________

being first duly sworn, on oath say(s) that:

1. (They are) (___he is) (___he knows) ____________________
____________________
____________________ the person(s) named as ____________________
____________________ in the document dated ____________________, ______, and filed for record ____________________, ______, as Document No. ____________________, [or in Book ______ of ____________ Page ____________ ] in the Office of the [County Recorder] [Registrar of Titles] of ______ ____________________ County, Minnesota.

2. Said Person(s) (is) (are) of legal age and under no legal disability with place of business(es) (respectively at)
____________________
____________________

   and for the last ten years (has) (have) resided at:

3. There have been no:
   a. Bankruptcy, divorce or dissolution proceedings involving said person(s) during the time said person(s) (have) (has) had any interest in the premises described in the above document ("Premises");
   b. Unsatisfied judgments of record against said person(s) nor any actions pending in any courts, which affect the Premises;
   c. Tax liens against said person(s);

   except as herein stated:

4. Any bankruptcy, divorce or dissolution proceedings of record against parties with the same or similar names, during the time period in which the above named person(s) (has) (have) had any interest in the Premises, are not against the above named person(s).

5. Any judgments, or tax liens of record against parties with the same or similar names are not against the above named person(s).

6. There has been no labor or materials furnished to the Premises for which payment has not been made.

7. There are no unrecorded contracts, leases, easements, or other agreements or interests relating to the Premises except as stated herein:

8. There are no persons in possession of any portion of the Premises other than pursuant to a recorded document except as stated herein:

9. There are no encroachments or boundary line questions affecting the Premises of which Affiant(s) (has) (have) knowledge.

Affiant(s) know(s) the matters herein stated are true and make(s) this Affidavit for the purpose of inducing the passing of title to the Premises.

____________________

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

MORTGAGELINQ CORPORATION, and Federal Home Loan Mortgage Corp.
v.
Richard GOTTFRIED, Donald Steerman, Park Place Holdings, Inc., Cape Atlantic Properties, Inc., National Financial Corp., Betty L. Culbert, Frank Bubblo, Patricia Baer, Black Swan, Inc., Steve Gentile, Debbie Hart, Atlantic Island Properties, Inc., and Gottfried & Company, Inc.

**Civ. A. No. 91-1618.**

July 21, 1992.

Jeffrey S. Saltz, Francine Friedman Griesing, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa.

Seth Weber, Philadelphia, Pa., Stanley Weinberg, Saidel, Sand and Saidel, Philadelphia, Pa.,

Robert E. Welsh, Jr., Philadelphia, Pa.,

James C. Schwartzman, Schwartzman and Hepps, Philadelphia, Pa.,

Glenn A. Zeitz, Zeitz & Talty, Philadelphia, Pa.,

Steven D. Scherzer, Cooper, Perksie, April, Neidelman, Wagenheim & Levenson, P.A., Atlantic City, N.J.,

Glenn A. Zeitz, pro se.

Michael N. Onufrak, White and Williams, Philadelphia, Pa., for Richard Angelo and Commonwealth Land Title Ins. Co.

Betty L. Culbert, pro se.

Jeffrey S. Adler, Richard A. O'Halloran, Baldwin, Renner, Bragg & Adler, P.C., Philadelphia, Pa.,

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

SHAPIRO, District Judge.

*1 Plaintiff, Mortgagelinq Corporation ("Mortgagelinq"), brought this action on March 13, 1991 under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq., and moved for a temporary restraining order preventing several of the defendants from transferring certain properties and funds. The complaint alleged that defendants had fraudulently obtained mortgages from Mortgagelinq on at least seven properties in amounts greater than the respective worth of the properties by misrepresenting the actual value of the properties. After a hearing on March 14, 18, and 21, 1991, the court granted Mortgagelinq's motion for a temporary restraining order; opinion filed March 22, 1991. Mortgagelinq filed an amended complaint on April 24, 1991 and a second amended complaint on October 3, 1991 adding several additional defendants and ultimately complaining of fraud as to twenty-four properties. On December 5, 1991, the court granted Mortgagelinq's motion for supplementary injunctive relief. On February 12, 1992, upon motion by defendant Longo Associates, the court appointed a temporary receiver to administer twenty-three of the properties. The court granted the motion of Federal Home Loan Mortgage Corporation ("Freddie Mac") to intervene as the current holder of the fraudulently obtained mortgages.

All of the defendants, except Ronald Wolf, Herbert Eppleman, and Gottfried & Company, have been dismissed or been held in default. The proceedings against Ronald Wolf and Herbert Eppleman have been stayed because they are in bankruptcy. Gottfried & Company has not contested this action; however, the court never formally entered default against it. On July 6, 1992, a hearing was held on the amount of damages plaintiffs sustained as a result of the fraudulent conduct of the following defendants: Richard Gottfried, Donald Steerman, Park Place Holdings, Inc., Cape Atlantic Properties, Inc., National Financial Corp., Betty L. Culbert, Frank Bubblo, Patricia Baer, Black Swan, Inc., Steve Gentile, Debbie Hart, Atlantic Island Properties, Inc., and Gottfried & Company, Inc.

I. *FINDINGS OF FACT ON LIABILITY*

1. Plaintiff MortgageLinq Corporation ("MortgageLinq") is a corporation organized and



EXHIBIT G

existing under Pennsylvania law with its principal place of business at 1202 Laurel Oak Road, Suite 105, Voorhees, New Jersey 08043. MortgageLinq is in the business of making mortgage loans in Pennsylvania and New Jersey. (Second Am.Compl. ¶ 1.)

2. Plaintiff Federal Home Loan Mortgage Corporation ("Freddie Mac") is a corporate instrumentality of the United States, created pursuant to 12 U.S.C. § § 1451 et seq., as amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, § 731, 101 Stat. 183 (Aug. 8, 1989).

3. Defendant Richard Gottfried is an individual who maintained a place of business at 1640 South Broad Street, Philadelphia, PA 19145. (Second Am.Compl. ¶ 2, modified.)

***2** 4. Defendant Leonard Gottfried is an individual maintaining a place of business at Overbrook Parkway and Westwood Lane, Wynnewood, PA 19096. Leonard Gottfried conducts business as a real estate appraiser and is the father of Richard Gottfried. (Second Am.Compl. ¶ 3, modified.)

5. Defendant Donald Steerman is an individual who maintained a place of business at 109 South Dover Avenue, Atlantic City, NJ 08225. (Second Am.Compl. ¶ 4, modified.)

6. Defendant Park Place Holdings, Inc. ("Park Place"), is a New Jersey corporation that maintained a place of business at 109 South Dover Avenue, Atlantic City, NJ 08225. Park Place is owned or controlled by Donald Steerman. (Second Am.Compl. ¶ 10, modified.)

7. Defendant Cape-Atlantic Properties, Inc. ("Cape-Atlantic"), is a corporation that maintained a place of business at 109 South Dover Avenue, Atlantic City, NJ 08225. The corporation was originally named Canadian Forest Products, Inc., and changed its name to Cape-Atlantic Properties, Inc., on October 12, 1990. Cape-Atlantic is owned or controlled by Donald Steerman. (Second Am.Compl. ¶ 11, modified.)

8. Defendant National Financial Corporation ("National Financial") is a corporation that maintained a place of business at 1640 South Broad Street, Philadelphia, PA 19145. National Financial is owned or controlled by Richard Gottfried. (Second Am.Compl. ¶ 12, modified.)

9. Defendant Atlantic Island Properties, Inc. ("Atlantic Island"), is a New Jersey corporation that maintained a place of business at 109 South Dover Avenue, Atlantic City, NJ 08225. Atlantic Island is owned or controlled by Donald Steerman. (Second Am.Compl. ¶ 13, modified.)

10. Defendant Betty L. Culbert is an individual who resided at Mariners Cove Marina, Northfield, NJ 08225. She is president of Atlantic Island. (Second Am.Compl. ¶ 14, modified.)

11. Defendant David Shapiro is an individual who resided at 259 Surrey Road, Southampton, PA 18966. (Second Am.Compl. ¶ 17, modified.)

12. Defendant Frank Bubblo is an individual maintaining a residence or place of business at 62 Broadway, Jim Thorpe, PA 18229. (Second Am.Compl. ¶ 18, modified.)

13. Defendant Patricia Baer is an individual maintaining a residence or place of business at 62 Broadway, Jim Thorpe, PA 18229. (Second Am.Compl. ¶ 19, modified.)

14. Defendant Black Swan, Inc., is a Pennsylvania corporation maintaining an address at 62 Broadway, Jim Thorpe, PA 18229. (Second Am.Compl. ¶ 20.)

15. Defendant Steve Gentile is an individual who maintained a place of business at 1640 South Broad Street, Philadelphia, PA 19145. At all times relevant hereto, Gentile was employed by National Financial and/or by Leonard Gottfried. (Second Am.Compl. ¶ 21, modified.)

16. Defendant Debbie Hart is an individual who maintained a place of business at 1640 South Broad Street, Philadelphia, PA 19145. At all times relevant hereto, Hart was employed by National Financial. (Second Am.Compl. ¶ 22, modified.)

***3** 17. Defendant Gottfried & Company, Inc., is a Pennsylvania corporation maintaining a place of business at Overbrook Parkway and Westwood Lane, Wynnewood, PA 19096. Gottfried & Company, Inc., is owned or controlled by Leonard Gottfried. (Second Am.Compl. ¶ 31A.)

*Defendants' Fraudulent Conduct*

18. As set forth in more detail below, defendants Richard Gottfried, Leonard Gottfried, and Donald Steerman have devised numerous schemes and artifices to defraud MortgageLinq and Freddie Mac through a series of fraudulent mortgage transactions.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Each of the other above-named defendants participated with Richard Gottfried, Leonard Gottfried, and Donald Steerman in one or more of such schemes and artifices. (Second Am.Compl. ¶ 33, modified.)

19. Pursuant to the schemes and artifices to defraud, defendants structured a series of fraudulent property transfers and mortgage transactions involving approximately twenty-four properties, in accordance with the following pattern:

(a) In each instance, a property was purchased from its owner for a price at or near its fair market value ("the 'A' transaction"). In virtually every instance, the property was a residential property in Atlantic County, New Jersey, and the purchaser was Park Place, Cape-Atlantic, or Atlantic Island.

(b) The buyer in the "A" transaction--in virtually every instance Park Place, Cape-Atlantic, or Atlantic Island--immediately purported to resell the property to one of the individual defendants ("the 'B' transaction"). The sales price in the "B" transaction was substantially higher than, and in most instances two to four times higher than, the purchase price in the "A" transaction.

(c) In each instance, National Financial, acting as a mortgage broker, submitted an application to MortgageLinq to provide mortgage financing for the buyer in the "B" transaction.

(d) In each instance, the application for mortgage financing would include a written appraisal signed by Leonard Gottfried, for himself and/or for Gottfried & Company, Inc., purporting to show that the property in question had a value at least as high as the sales price in the "B" transaction. The appraisal was clearly false and fraudulent in its representation of value, in view of the fact that the property was, at the same time, being purchased at arm's length, in the "A" transaction, for an amount in most instances less than half of the amount shown in the appraisal. In many instances, the appraisal was based in part on purported comparable sales of properties that were themselves the subject of fraudulent purchases and resales by Park Place, Cape- Atlantic, or Atlantic Island. In addition, the appraisal in many instances misrepresented the rental income of the property.

(e) In many instances, the mortgage loan application also included false, fraudulent, forged, or altered documents relating to the income, assets, or employment of the borrower-applicant. Such documents included forged or altered bank documents verifying amounts on deposit and forged or altered copies of IRS Form W-2 (Wage and Tax Statement).

***4** (f) In most instances, the mortgage loan application also included a credit report on the borrower-applicant, on the letterhead of "Diversified Reporting Bureau, Inc." The address on the letterhead is the registered address of National Financial. "Diversified Reporting Bureau, Inc.," does not exist as a legal entity and is a fiction devised by National Financial.

(g) In each instance, MortgageLinq, acting in reliance on the mortgage application, including the fraudulent appraisal, issued a mortgage loan to the buyer in the "B" transaction in the amount of approximately 70% of the purported sales price (on the understanding that the remaining 30% was being paid by the buyer as a down payment) and provided funds pursuant to the loan at settlement.

(h) In each instance, neither National Financial nor any other defendant disclosed to MortgageLinq that the property was being contemporaneously purchased in an "A" transaction for substantially less than the amount represented in the written appraisal to be the value of the property and for substantially less than the purported sales price in the "B" transaction.

(i) In virtually every instance, the settlements on the "A" transaction and the "B" transaction took place on the same day and at the same time. In most instances, the settlements took place at the offices of National Financial at 1640 South Broad Street, Philadelphia, Pennsylvania, or elsewhere in Philadelphia.

(j) In many instances, a check was paid at settlement to Richard Gottfried in the amount of $400, reflected on the Settlement Statement as being paid $200 from the borrower's funds and $200 from the seller's funds. Richard Gottfried thereupon endorsed this $400 check over to the settlement clerk. Upon information and belief, this payment was not legitimate compensation for any services properly provided by the settlement clerk.

(k) In some instances, the buyer in the "B" transaction then transferred the property back to the seller--Park Place, Cape-Atlantic, or Atlantic Island--for consideration of one dollar. (Second Am.Compl. ¶ 34, modified.)

20. The participation of each above-named defendant in the schemes and artifices to defraud

included the following:

(a) Richard Gottfried managed the affairs of National Financial and participated in the preparation and submission of fraudulent mortgage applications.

(b) Leonard Gottfried and Gottfried & Company, Inc., prepared and/or signed the fraudulent appraisals.

(c) Donald Steerman managed the affairs of Park Place, Cape-Atlantic, and Atlantic Island and participated in the purchase of properties and their fraudulent resale at artificial prices.

(d) Betty L. Culbert, David Shapiro, Frank Bubblo, and Patricia Baer were buyers in some of the "B" transactions, as set forth more fully below.

(e) Park Place, Cape-Atlantic, and Atlantic Island were sellers in all but one of the "B" transactions, as set forth more fully below.

***5** (f) National Financial, as mortgage broker, prepared and submitted the fraudulent mortgage applications.

(g) Steve Gentile, individually or as an employee of National Financial, participated in the preparation and submission of fraudulent mortgage applications by National Financial. He received payments from the proceeds of many of the transactions described below.

(h) Debbie Hart, individually or as an employee of National Financial, participated in the preparation and submission of fraudulent mortgage applications by National Financial. (Second Am.Compl. ¶ 35, modified.)

21. By reason of the false and fraudulent transactions devised by and participated in by defendants, pursuant to their schemes and artifices to defraud, MortgageLinq was induced to advance settlement funds in each instance for an amount substantially higher than the fair-market value of the mortgaged property. (Second Am.Compl. ¶ 36, modified.)

*7 North Sacramento Avenue*

22. On May 29, 1990, Cape-Atlantic (then known as Canadian Forest Products, Inc.) purchased property located at 7 North Sacramento Avenue, Ventnor, New Jersey, from its owners for $125,000. (Second Am.Compl. ¶ 37.)

23. On or prior to the same date, Cape-Atlantic (then known as Canadian Forest Products, Inc.) sold the same property to David Shapiro for $410,000. (Second Am.Compl. ¶ 38.)

24. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $287,000 in connection with the sale to David Shapiro. (Second Am.Compl. ¶ 39.)

25. On November 27, 1990, David Shapiro purported to sell the same property to Jennie S. Gates for $415,000. (Second Am.Compl. ¶ 40.)

26. MortgageLinq's loan to David Shapiro was paid off from the proceeds of the sale to Jennie S. Gates; however, in reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a new mortgage loan of $287,000 in connection with the sale. (Second Am.Compl. ¶ 41.)

27. On the same day, November 27, 1990, the property was transferred from Jennie S. Gates back to Cape-Atlantic for a stated consideration of $1.00. (Second Am.Compl. ¶ 42, modified.)

*26 North Brighton Avenue*

28. On June 27, 1990, Park Place purchased property located at 26 North Brighton Avenue, Atlantic City, New Jersey, from its owner for $170,000. (Second Am.Compl. ¶ 43.)

29. On the same day, Park Place purportedly sold the same property to Herbert B. Eppleman for $400,000. (Second Am.Compl. ¶ 44, modified.)

30. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $280,000 in connection with the sale to Herbert B. Eppleman. (Second Am.Compl. ¶ 45.)

*23 South Adams Avenue*

31. On July 11, 1990, Atlantic Island purchased property located at 23 South Adams Avenue, Margate, New Jersey, from its owners for $175,000. (Second Am.Compl. ¶ 46.)

***6** 32. On the same day, Atlantic Island sold the same property to Betty L. Culbert for $492,000. (Second Am.Compl. ¶ 47.)

33. In reliance on a fraudulent loan application

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

package submitted by National Financial, MortgageLinq provided a mortgage loan of $344,000 in connection with the sale to Betty L. Culbert. (Second Am.Compl. ¶ 48.)

*416 Doughty Road*

34. On July 31, 1990, Park Place purchased property located at 416 Doughty Road, Pleasantville, New Jersey, from its owner for $120,000. (Second Am.Compl. ¶ 49.)

35. On the same day, Park Place sold the same property to Richard Gottfried for $480,000. (Second Am.Compl. ¶ 50.)

36. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $336,000 in connection with the sale to Richard Gottfried. (Second Am.Compl. ¶ 51.)

37. On or about the next day, August 1, 1990, Richard Gottfried transferred the property back to Park Place for a stated consideration of $1.00. (This deed to Park Place was recorded prior to the July 31 deed to Richard Gottfried.) (Second Am.Compl. ¶ 52.)

38. On August 17, 1990, by a deed from Park Place and Richard Gottfried, the property was purportedly sold to Craig Steerman for $480,000. (Second Am.Compl. ¶ 53, modified.)

39. MortgageLinq's loan to Richard Gottfried was paid off from the proceeds of the sale to Craig Steerman; however, in reliance on a fraudulent loan application submitted by National Financial, MortgageLinq provided a new mortgage loan of $336,000 in connection with the sale. (Second Am.Compl. ¶ 54.)

40. On December 28, 1990, the property was transferred from Craig Steerman back to Park Place for a stated consideration of $1.00. (Second Am.Compl. ¶ 55, modified.)

*22 Shadeland Avenue*

41. On September 10, 1990, Park Place purchased property located at 22 Shadeland Avenue, Pleasantville, New Jersey, from its owner for $106,720. (Second Am.Compl. ¶ 56.)

42. On the same day, Park Place purportedly sold the same property to Craig Steerman for $480,000. (Second Am.Compl. ¶ 57.)

43. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $336,000 in connection with the sale to Craig Steerman. The mortgage instrument purportedly signed by Craig Steerman was dated September 6, 1990. (Second Am.Compl. ¶ 58, modified.)

44. On October 22, 1990, the property was transferred from Craig Steerman back to Park Place for a stated consideration of $1.00. (Second Am.Compl. ¶ 59, modified.)

45. On December 28, 1990, the property was again purportedly transferred from Craig Steerman back to Park Place for a stated consideration of $1.00. (Second Am.Compl. ¶ 60, modified.)

*9606 Monmouth Avenue*

46. On September 27, 1990, Park Place purchased property located at 9606 Monmouth Avenue, Margate, New Jersey, from its owner for $229,000. (Second Am.Compl. ¶ 61.)

***7** 47. On the same day, Park Place purportedly sold the same property to Jennie S. Gates for $475,000. (Second Am.Compl. ¶ 62, modified.)

48. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $332,500 in connection with the sale to Jennie S. Gates. (Second Am.Compl. ¶ 63.)

49. On October 22, 1990, the property was transferred from Jennie S. Gates back to Park Place for a stated consideration of $1.00. (Second Am.Compl. ¶ 64.)

50. On December 28, 1990, the property was again purportedly transferred from Jennie S. Gates back to Park Place for a stated consideration of $1.00. (Second Am.Compl. ¶ 65, modified.)

*120 North New Haven Avenue*

51. On October 17, 1990, Park Place purchased property located at 120 North New Haven Avenue, Ventnor, New Jersey, from its owners for $115,000. (Second Am.Compl. ¶ 66.)

52. On the same day, Park Place purportedly sold the same property to Herbert B. Eppleman for $410,000. (Second Am.Compl. ¶ 67.)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

53. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $287,000 in connection with the sale to Herbert B. Eppleman. (Second Am.Compl. ¶ 68.)

54. On October 22, 1990, the property was transferred from Herbert B. Eppleman back to Park Place for a stated consideration of $1.00. (Second Am.Compl. ¶ 69, modified.)

55. On December 28, 1990, the property was again purportedly transferred from Herbert B. Eppelman back to Park Place for a stated consideration of $1.00. (Second Am.Compl. ¶ 70, modified.)

*62 Broadway*

56. On October 26, 1990, Black Swan, Inc., purchased property located at 62 Broadway, Jim Thorpe, Pennsylvania, from its owners for $177,000. (Second Am.Compl. ¶ 71.)

57. On the same day, Black Swan, Inc., sold the same property to Frank Bubblo and Patricia Baer for $295,000. (Second Am.Compl. ¶ 72.)

58. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $236,000 in connection with the sale to Frank Bubblo and Patricia Baer. (Second Am.Compl. ¶ 73.)

*20 South Adams Avenue*

59. On November 8, 1990, Park Place purchased property located at 20 South Adams Avenue, Margate, New Jersey, from its owner for $190,000. (Second Am.Compl. ¶ 74.)

60. On the same day, Park Place purportedly sold the same property to Ronald Wolf for $410,000. (Second Am.Compl. ¶ 75, modified.)

61. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $287,000 in connection with the sale to Ronald Wolf. (Second Am.Compl. ¶ 76.)

62. On November 19, 1990, the property was transferred from Ronald Wolf back to Park Place for a stated consideration of $1.00. (Second Am.Compl. ¶ 77, modified.)

*4803 Ventnor Avenue*

63. On November 15, 1990, Atlantic Island purchased property located at 4803 Ventnor Avenue, Ventnor, New Jersey, from its owner for $210,000. (Second Am.Compl. ¶ 78.)

***8** 64. On the same day, Atlantic Island sold the same property to Betty L. Culbert for $490,000. (Second Am.Compl. ¶ 79.)

65. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $343,000 in connection with the sale to Betty L. Culbert. (Second Am.Compl. ¶ 80.)

66. On the same day, November 15, 1990, Betty L. Culbert transferred the property back to Atlantic Island for a stated consideration of $1.00. (Second Am.Compl. ¶ 81.)

*22 South Adams Avenue*

67. On November 20, 1990, Park Place purchased property located at 22 South Adams Avenue, Margate, New Jersey, from its owners for $190,000. (Second Am.Compl. ¶ 82.)

68. On the same day, Park Place purportedly sold the same property to Ronald Wolf for $410,000. (Second Am.Compl. ¶ 83, modified.)

69. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $287,000 in connection with the sale to Ronald Wolf. (Second Am.Compl. ¶ 84.)

70. By a deed dated the prior day, November 19, 1990, but recorded after the deed from Park Place to Ronald Wolf, the property was transferred from Ronald Wolf back to Park Place for a stated consideration of $1.00. (Second Am.Compl. ¶ 85, modified.)

*24 South Weymouth Avenue*

71. On December 11, 1990, Atlantic Island purchased property located at 24 South Weymouth Avenue, Ventnor, New Jersey, from its owners for $115,000. (Second Am.Compl. ¶ 86.)

72. On the same day, Atlantic Island purportedly sold the same property to Angel Rua for $412,000. (Second Am.Compl. ¶ 87, modified.)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

73. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $287,000 in connection with the sale to Angel Rua. (Second Am.Compl. ¶ 88.)

74. On the same day, December 11, 1990, the property was transferred from Angel Rua back to Atlantic Island for a stated consideration of $1.00. (Second Am.Compl. ¶ 89, modified.)

*20 West Maryland Avenue*

75. On December 13, 1990, Park Place purchased property located at 20 West Maryland Avenue, Somers Point, New Jersey, from its owners for $125,000. (Second Am.Compl. ¶ 90.)

76. On the same day, Park Place purportedly sold the same property to Angel Rua for $412,000. (Second Am.Compl. ¶ 91, modified.)

77. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $287,000 in connection with the sale to Angel Rua. (Second Am.Compl. ¶ 92.)

*9402 Winchester Avenue*

78. On December 20, 1990, Park Place purchased property located at 9402 Winchester Avenue, Margate, New Jersey, from its owner for $262,500. (Second Am.Compl. ¶ 93.)

79. On the same day, Park Place purportedly sold the same property to Jennie S. Gates for $498,000. (Second Am.Compl. ¶ 94, modified.)

80. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $348,600 in connection with the sale to Jennie S. Gates. (Second Am.Compl. ¶ 95.)

*26 South Maine Avenue*

***9** 81. On December 31, 1990, Park Place purchased property located at 26 South Maine Avenue, Atlantic City, New Jersey, from its owners for $148,500. (The deed to Park Place was dated December 28, 1990, but settlement was held on December 31, 1990.) (Second Am.Compl. ¶ 96.)

82. On the same day, Park Place purportedly sold the same property to Ronald Wolf for $412,000. (Second Am.Compl. ¶ 97, modified.)

83. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $287,000 in connection with the sale to Ronald Wolf. (Second Am.Compl. ¶ 98.)

*9208 Winchester Avenue*

84. On January 10, 1991, Park Place purchased property located at 9208 Winchester Avenue, Margate, New Jersey, from its owners for $157,000. (Second Am.Compl. ¶ 99.)

85. On the same day, Park Place purportedly sold the same property to John P. Payne for $410,000. (Second Am.Compl. ¶ 100, modified.)

86. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $287,000 in connection with the sale to John P. Payne. (Second Am.Compl. ¶ 101.)

*9206 Winchester Avenue*

87. On January 10, 1991, Park Place purchased property located at 9206 Winchester Avenue, Margate, New Jersey, from its owners for $148,000. (Second Am.Compl. ¶ 102.)

88. On the same day, Park Place purportedly sold the same property to Herbert B. Eppleman for $412,000. (Second Am.Compl. ¶ 103, modified.)

89. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $287,000 in connection with the sale to Herbert B. Eppleman. (Second Am.Compl. ¶ 104.)

*2 North Chelsea Avenue*

90. On January 17, 1991, Park Place purchased property located at 2 North Chelsea Avenue, Atlantic City, New Jersey, from its owner for $90,000. (Second Am.Compl. ¶ 105.)

91. On the same day, Park Place purportedly sold the same property to John P. Payne for $415,000. (Second Am.Compl. ¶ 106, modified.)

92. In reliance on a fraudulent loan application package submitted by National Financial,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

MortgageLinq provided a mortgage loan of $287,000 in connection with the sale to John P. Payne. (Second Am.Compl. ¶ 107.)

*106 South Little Rock Avenue*

93. On January 17, 1991, Park Place purchased property located at 106 South Little Rock Avenue, Ventnor, New Jersey, from its owner for $370,000. (Second Am.Compl. ¶ 108; Ex. P-19-1.)

94. On the same day, Park Place sold the same property to Betty L. Culbert for $499,500. (Second Am.Compl. ¶ 109.)

95. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $343,000 in connection with the sale to Betty L. Culbert. (Second Am.Compl. ¶ 110.)

*12 North Stenton Avenue*

96. On January 24, 1991, Park Place purchased property located at 12 North Stenton Avenue, Atlantic City, New Jersey, from its owner for $91,250. (The deed to Park Place was dated January 23, 1991, but settlement was held on January 24, 1991.) (Second Am.Compl. ¶ 111.)

***10** 97. On the same day, Park Place purportedly sold the same property to Sharon Wolf for $415,000. (Second Am.Compl. ¶ 112, modified.)

98. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $290,000 in connection with the sale to Sharon Wolf. (Second Am.Compl. ¶ 113.)

*12 South Florida Avenue*

99. On January 24, 1991, Park Place purchased property located at 12 South Florida Avenue, Atlantic City, New Jersey, from its owners for $95,000. (Second Am.Compl. ¶ 114.)

100. On the same day, Park Place purportedly sold the same property to Sharon Wolf for $470,000. (Second Am.Compl. ¶ 115, modified.)

101. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $329,000 in connection with the sale to Sharon Wolf. (Second Am.Compl. ¶ 116.)

*204-206 Washington Avenue*

102. On February 7, 1991, Cape-Atlantic purchased property located at 204-206 Washington Avenue, Margate, New Jersey, from its owner for $125,000. (The deed to Cape-Atlantic was dated February 2, 1991, but settlement was held on February 7, 1991.) (Second Am.Compl. ¶ 117.)

103. On the same day, Cape-Atlantic purportedly sold the same property to John P. Payne for $413,000. (Second Am.Compl. ¶ 118, modified.)

104. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $289,100 in connection with the sale to John P. Payne. (Second Am.Compl. ¶ 119.)

*9305 Monmouth Avenue*

105. On February 7, 1991, Cape-Atlantic purchased property located at 9305 Monmouth Avenue, Margate, New Jersey, from its owner for $75,000. (The deed to Cape Atlantic was dated February 2, 1991, but settlement was held on February 7, 1991.) (Second Am.Compl. ¶ 120.)

106. On the same day, Cape-Atlantic purportedly sold the same property to Sharon Wolf for $110,000. (Second Am.Compl. ¶ 121, modified.)

107. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $82,500 in connection with the sale to Sharon Wolf. (Second Am.Compl. ¶ 122.)

*21 North LaClede Place*

108. On February 7, 1991, Park Place purchased property located at 21 North LaClede Place, Atlantic City, New Jersey, from its owner for $132,000. (Second Am.Compl. ¶ 123.)

109. On the same day, Park Place purportedly sold the same property to Angel Rua for $415,000. (Second Am.Compl. ¶ 124, modified.)

110. In reliance on a fraudulent loan application package submitted by National Financial, MortgageLinq provided a mortgage loan of $290,500 in connection with the sale to Angel Rua. (Second Am.Compl. ¶ 125.)

*Other Findings*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

111. All of the loans in question were sold by MortgageLinq to Freddie Mac. (Second Am.Compl. ¶ 126(b), modified.)

112. In pursuance of their schemes and artifices to defraud or for obtaining money by false and fraudulent pretenses, representations, and promises, defendants engaged in the use of the mails of the United States Postal Service on numerous occasions, including but not limited to mailings of monthly mortgage payments prior to the commencement of this action. (Second Am.Compl. ¶ 129, modified.)

***11** 113. In pursuance of their schemes and artifices to defraud or for obtaining money by false and fraudulent pretenses, representations, and promises, defendants caused numerous wire communications in interstate commerce to be made, including but not limited to numerous telephone and telecopier communications between National Financial in Pennsylvania and MortgageLinq in New Jersey. (Second Am.Compl. ¶ 130, modified.)

114. National Financial is an enterprise engaged in, or the activities of which affect, interstate commerce. (Second Am.Compl. ¶ 132.)

115. Park Place, Cape-Atlantic, and Atlantic Island are enterprises engaged in, or the activities of which affect, interstate commerce. (Second Am.Compl. ¶ 136.)

II. *FINDINGS OF FACT ON DAMAGES*

1. No payments have been made on any of the twenty-four outstanding mortgage loans since the commencement of this action in March 1991.

2. The following figures represent, for each of the twenty-four properties, (a) the original principal loan amount advanced by MortgageLinq, (b) the total payments made toward principal on the loan, and (c) the outstanding principal balance--i.e., (a) minus (b):

| Property | (a) Orig. Loan Amt. | (b) Princ. Payments | (c) Princ. Bal. |
|---|---|---|---|
| 7 N. Sacramento | $287,000 | 309.83 | 286,690.17 |
| 26 N. Brighton | 280,000 | 917.99 | 279,082.01 |
| 23 S. Adams | 344,000 | 982.47 | 343,017.53 |
| 416 Doughty | 336,000 | 797.28 | 335,202.72 |
| 22 Shadeland | 336,000 | 661.45 | 335,338.55 |
| 9606 Monmouth | 332,500 | 654.60 | 331,845.40 |
| 120 N. New Haven | 287,000 | 450.03 | 286,549.97 |
| 62 Broadway | 236,000 | 188.40 | 235,811.60 |
| 20 S. Adams | 287,000 | 345.18 | 286,654.82 |
| 4803 Ventnor | 343,000 | 412.52 | 342,587.48 |
| 22 S. Adams | 287,000 | 345.18 | 286,654.82 |
| 24 S. Weymouth | 287,000 | 205.61 | 286,794.39 |
| 20 W. Maryland | 287,000 | 205.61 | 286,794.39 |
| 9402 Winchester | 348,600 | 249.74 | 348,350.26 |
| 26 S. Maine | 287,000 | 205.61 | 286,794.39 |
| 9208 Winchester | 287,000 | 102.34 | 286,897.66 |
| 9206 Winchester | 287,000 | 102.34 | 286,897.66 |
| 2 N. Chelsea | 287,000 | 102.34 | 286,897.66 |
| 106 S. Little Rock | 349,600 | 124.66 | 349,475.34 |
| 12 N. Stenton | 290,500 | 103.58 | 290,396.42 |
| 12 S. Florida | 329,000 | 117.32 | 328,882.68 |
| 204-06 Washington | 289,100 | .00 | 289,100.00 |
| 9305 Monmouth | 82,500 | .00 | 82,500.00 |
| 21 N. LaClede | 290,500 | .00 | 290,500.00 |

3. On each of the following properties, the purported signatures of the mortgagor on the Note and Mortgage to MortgageLinq are not in fact genuine signatures:

7 N. Sacramento
416 Doughty
22 Shadeland
9606 Monmouth
120 N. New Haven
20 S. Adams
22 S. Adams
24 S. Weymouth
20 W. Maryland
9402 Winchester
26 S. Maine
9208 Winchester
9206 Winchester
2 N. Chelsea
12 N. Stenton
12 S. Florida
204-06 Washington
9305 Monmouth
21 N. LaClede

4. On each of the following properties, Plaintiffs can recover approximately the following amounts through mortgage foreclosures:

| | |
|---|---|
| 26 N. Brighton | $ 25,000 |
| 23 S. Adams | 35,000 |
| 62 Broadway | 177,000 |
| 4803 Ventnor | 224,500 |
| 106 S. Little Rock | 337,000 |

***12** 5. On each of the following properties, plaintiffs will receive value by the conveyance of title to plaintiffs:

7 North Sacramento Avenue
416 Doughty Road
22 Shadeland Avenue
9606 Monmouth Avenue
120 North New Haven Avenue
20 South Adams Avenue
22 South Adams Avenue
24 South Weymouth Avenue
20 W. Maryland Avenue
9402 Winchester Avenue
26 South Maine Avenue
9208 Winchester Avenue
9206 Winchester Avenue
2 North Chelsea Avenue
12 North Stenton Avenue
12 South Florida Avenue
204-206 Washington Avenue
9305 Monmouth Avenue
21 North LaClede Place

6. Plaintiffs' total damages caused by the fraudulent schemes described above are as follows:

| | |
|---|---|
| Total Outstanding Principal Balances | $7,049,715.92 |
| Less Estimated Mortgage Foreclosure Proceeds | 798,500.00 |
| TOTAL DAMAGES | $6,251,215.92 |

This amount will be reduced by the amount realized on the sale of the properties listed above at ¶ 5.

III. *CONCLUSIONS OF LAW*

1. The court has jurisdiction of the subject matter of this action under 28 U.S.C. § § 1331 and 1367.

2. Under prior orders of the court, all defendants except Gottfried & Company have been held in default; Gottfried & Company does not contest liability.

3. Defendants' use of the mails of the United States

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Postal Service, in pursuance of their schemes and artifices to defraud or for obtaining money by false and fraudulent pretenses, constitutes mail fraud in violation of 18 U.S.C. § 1341.

4. Defendants' use of wire communications in interstate commerce, in pursuance of their schemes and artifices to defraud or for obtaining money by false and fraudulent pretenses, constitutes wire fraud in violation of 18 U.S.C. § 1343.

5. Defendants, other than National Financial, have conducted or participated, directly or indirectly, in the conduct of National Financial's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), or have aided and abetted such violation.

6. Defendants, other than Park Place, Cape-Atlantic, and Atlantic Island, have conducted or participated, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), or have aided or abetted such violation.

7. Plaintiffs are entitled to judgment against defendants for treble the amount of their damages, a total of $18,753,647.76. Defendants are entitled to a reduction of that amount in the amount realized by plaintiffs on the sale of the properties listed below at ¶ 8.

8. In accordance with **Federal Rule of Civil Procedure 70**, defendants Park Place Holdings, Inc., Cape-Atlantic Properties, Inc., and Atlantic Island Properties, Inc. shall be required to transfer title to the following properties to plaintiffs:

7 North Sacramento Avenue, Ventnor, New Jersey
416 Doughty Road, Pleasantville, New Jersey
***13** 22 Shadeland Avenue, Pleasantville, New Jersey
9606 Monmouth Avenue, Margate, New Jersey
120 North New Haven Avenue, Ventnor, New Jersey
20 South Adams Avenue, Margate, New Jersey
22 South Adams Avenue, Margate, New Jersey
24 South Weymouth Avenue, Ventnor, New Jersey
20 W. Maryland Avenue, Somers Point, New Jersey
9402 Winchester Avenue, Margate, New Jersey
26 South Maine Avenue, Atlantic City, New Jersey
9208 Winchester Avenue, Margate, New Jersey
9206 Winchester Avenue, Margate, New Jersey
2 North Chelsea Avenue, Atlantic City, New Jersey
12 North Stenton Avenue, Atlantic City, New Jersey
12 South Florida Avenue, Atlantic City, New Jersey
204-206 Washington Avenue, Margate, New Jersey
9305 Monmouth Avenue, Margate, New Jersey
21 North LaClede Place, Atlantic City, New Jersey

9. The preliminary injunction dated March 22, 1991 shall be vacated. The clerk of court will return to MortgageLinq the $50,000 security bond posted as required by Federal Rule of Civil Procedure 65(c) upon the issuance of the preliminary injunction.

1992 WL 174723, 1992 WL 174723 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

H
Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.

Wayne M. ROUSSEAU
v.
3 EAGLES AVIATION, INC.

**No. Civ.A. 02-0208.**

Jan. 28, 2004.

Jennifer Cortes, Blue Williams, L.L.P., Metairie, LA, Robert R. Johnston, Daniel Lichtl, Fowler, Rodriguez, Kingsmill, Flint, Gray & Chalos, David L. Bell, David L. Bell & Associates, LLC, New Orleans, LA, for Wayne M. Rousseau.

Brent Bennett Barriere, Katherine Miller Determan, Phelps Dunbar, LLP, Jennifer Burrows McNamara, Shaw Norton Degan, LLP, New Orleans, LA, for 3 Eagles Aviation, Inc.

*ORDER AND REASONS*

VANCE, J.

***1** Defendant 3 Eagles Aviation, Inc. moves this Court to hold Clayton Kresge, President of Standard Collision, in contempt of court and to award sanctions to 3 Eagles for Kresge's failure to comply with this Court's September 2, 2003 order (Rec.Doc. No. 117). Defendant has filed no opposition to the motion for contempt and sanctions. For the following reasons, the Court GRANTS 3 Eagles's motion.

I. Background

In October 2002, this Court entered judgment against plaintiff Wayne Rousseau, judgment debtor, and in favor of 3 Eagles in the amount of $1,341,462,14, plus interest at the rate of $556.44 per diem. In order to satisfy the judgment, 3 Eagles applied for and obtained a writ of fieri facias ordering the United States Marshal for the United States District Court for the Eastern District of Louisiana to seize and to take into his possession the property, rights, and credits of Rousseau.

In February 2002, Rousseau tendered to Standard Collision three checks totaling $285,028.87. In June 2003, the United States Marshal served a citation, a petition of garnishment, and garnishment interrogatories on Standard through its registered agent for service of process, Clayton Kresge, who is also the president of the corporation. Standard, through its attorney of record, confirmed under oath that Rousseau had invested $285,028.87 in Standard in return for a 3.6774% interest in the company's common stock.

In August 2003, 3 Eagles filed a Motion for Order to Turn Over and Deposit Seized Funds. One month later, this Court issued an order directing Standard to liquidate Rousseau's investment and to turn over and deposit the sum of $285,028.87 into this Court's registry. This order was personally served on Kresge on September 23, 2003.

3 Eagles now moves the Court to hold Kresge in contempt and to sanction him pursuant to **Federal Rule of Civil Procedure 70**. 3 Eagles alleges that since the order was personally served on Kresge, Kresge has neither liquidated Rousseau's investment, nor has he deposited the requisite monies into the Court's registry. [FN1]

FN1. In December 2003, counsel for plaintiff and defendant moved to continue submission of this matter until January 7, 2003. The Court granted the motion to continue. Despite the continuance, defendant has still not filed an opposition to the motion for contempt and sanctions.

II. Discussion

It is axiomatic that a district court has jurisdiction to enforce its own order. *See* *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir.1977). Pursuant to Rule 70, this Court has the power to adjudge a party in contempt and to sanction him for failure to comply with a court order. *See* Fed. R. Civ. P. 70; *Gilbert v. Johnson*, 490 F.2d 827, 830 (5th Cir.1974). [FN2] Rule 70 states, in pertinent part,

FN2. A garnishee is a party to a suit. *See, e.g.*, *Simon v. Montgomery*, 54 F.Supp.2d 673, 675 (M.D.La.1999) (holding that pursuant to the Louisiana Code of Civil Procedure, a garnishee is a party to a civil suit); *Conversion Chem. Corp. v. Dr.-Ing. Max Schloetter Fabrik Fur Galvanotechnik*,


EXHIBIT H

49 F.R.D. 126, 127-28 (D.Conn.1969) (holding that a garnishee is a party to a civil suit for purposes of Federal Rule of Civil Procedure 34).

[i]f a judgment directs a party ... to perform any other specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party ... The court may also in proper cases adjudge the party in contempt.

Fed. R. Civ. P. 70. In addition, a court may award the moving party in a civil contempt proceeding attorneys' fees. *See* Cook, 559 F.2d at 272. "The theory for allowing attorneys' fees for civil contempt is that civil contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *Id.* (citing *United States v. United Mine Workers,* 330 U.S. 258, 303-04, 67 S.Ct. 677, 91 L.Ed. 884 (1947)).

***2** "Contempt is committed when a person 'violates an order of a court requiring in specific and definite language that a person do or refrain from doing an act." ' *In re Baum,* 606 F.2d 592, 593 (5th Cir.1979) (quoting *Baumrin v. Cournoyer,* 448 F.Supp. 225, 227 (D.Mass.1978)). "Civil contempt ... 'is designed to coerce the comtemnor to comply with a court order...." ' *Nasco, Inc. v. Calcasieu Television & Radio, Inc.,* 583 F.Supp. 115, 119 (W.D.La.1984). In a motion to hold a disobedient party in contempt, the moving party, here, 3 Eagles, bears the burden of proving by clear and convincing evidence that (1) a court order is in effect; (2) the order requires certain conduct by the disobedient party; and (3) the diosbedient party has failed to perform an act in violation of the court's order. *See id.*

Here, 3 Eagles meets this burden. This Court's order to Standard Collision to liquidate Rousseau's investment and to deposit the monies into the Court's registry is in effect. The Court order specifically requires Standard to perform the above task "immediately." (Rec.Doc. No. 117). It has been over 45 days since service of this Court's order on Kresge, and he has failed to comply with the order. For the foregoing reasons, the Court holds Clayton Kresge, as president of Standard Collision, in contempt. [FN3]

FN3. The Court notes that Clayton Kresge, as president and sole officer of Standard Collision, *see* Def.'s Ex. 1, is the proper party to hold in contempt and to sanction because he is responsible for the acts of the corporation. *See, e.g., Wilson v. United States,* 221 U.S. 361, 376, 31 S.Ct. 538, 55 L.Ed. 771 (1911) ("A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, ... fail to take appropriate action within their power for the performance of the corporate duty, they, no less that the corporation itself, are guilty of disobedience, and may be punished for contempt.").

Moreover, the Court finds an award to 3 Eagles of attorneys' fees appropriate here. The Fifth Circuit has reasoned that attorneys' fees are appropriate in a civil contempt proceeding because the moving party suffers further monetary damages when it is forced to bring a violation of a court order to the attention of the court: "It matters not whether the disobedience is willful, the cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party and those costs would reduce any benefits gained by the prevailing party from the court's violated order." Cook, 559 F.2d at 272. For this reason, the Court exercises its discretion and awards reasonable attorneys' fees to 3 Eagles for the cost of ensuring compliance with this Court's September 2, 2003 order.

III. Conclusion

For the foregoing reasons, the Court GRANTS 3 Eagles motion. Clayton Kresge, as president of Standard Collision, is adjudged in contempt of court and ordered to pay reasonable attorneys' fees to 3 Eagles for the cost of bringing this violation to the attention of the court. The Court orders 3 Eagles to submit an affidavit attesting to its legal fees and the basis of its computation of those fees by February 18, 2004.

It is further ordered that Kresge has ten days from service of this order in which to comply with this Court's September 2, 2003 order.

2004 WL 193108 (E.D.La.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works